UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

      Marshall L. Spies, II and
      Kelly A. Spies,

                 Debtors.

Case No. 09-30283-mcr
Chapter 7

White's Lumber, Inc.,

                 Plaintiff,

v.

Marshall L. Spies, II and
Kelly A. Spies,

                 Defendants.

Adv. Proc. No. 09-50121-5-mcr

FILED
2011 JUL 29 PM 5:00
CLERK OF THE
BANKRUPTCY COURT
N.D. OF NY
SYRACUSE

Appearances:

Conboy, McKay, Bachman & Kendall, LLP
Attorneys for Plaintiff
407 Sherman Street
Watertown, NY 13601

David B. Geurtsen, Esq.

Antonucci Law Firm
Attorneys for Defendants
12 Public Square
Watertown, NY 13601

David P. Antonucci, Esq.

Hon. Margaret Cangilos-Ruiz, U.S. Bankruptcy Judge

## MEMORANDUM-DECISION

    White's Lumber, Inc. ("Plaintiff") seeks a determination in this action that a debt

allegedly owed by Marshall L. Spies, II and his wife, Kelly A. Spies, ("Debtors" or

"Defendants"), is nondischargeable under § 523(a)(4) of the Bankruptcy Code.[1] The debt arose

in connection with the construction of two homes and is the subject of a consensual state court

---

[1] Unless otherwise indicated, all statutory references are to 11 U.S.C. §§ 101–1532 (2011) ("Code").

judgment entered against Marshall Spies prior to bankruptcy. The claim that it is nondischargeable is based upon allegations of Debtors' fraud and defalcation while acting in a fiduciary capacity arising from misappropriation of trust funds under Article 3-A of the New York Lien Law ("Article 3-A"), N.Y. LIEN LAW §§ 70 – 79-a (Consol. 2010) ("Lien Law"). Defendants answered the complaint by way of general denial and raised various affirmative defenses.[2]

The court conducted a trial on October 8, 2010, at which Plaintiff's personnel and credit manager, Maurice Cleaver, and Defendants testified. The parties stipulated to the admission of Plaintiff's exhibits and a statement of uncontested material facts contained in Plaintiff's pre-trial statement ("Uncontested Facts").[3] Following the filing of post-trial memoranda, the court took the matter under advisement. This memorandum-decision incorporates the court's findings of facts and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

JURISDICTION

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and §§ 157(a), 157(b)(1) and 157(b)(2)(I).

BACKGROUND FACTS

Based upon the record, the court makes the following findings. On February 12, 2009, Debtors filed a joint chapter 13 case, which was voluntarily converted to chapter 7 on May 5, 2009. Plaintiff subsequently commenced this action, seeking to find its debt nondischargeable in

---

[2] Only the affirmative defenses for which Defendants advanced argument and produced evidence at trial are addressed herein.

[3] The court admitted Plaintiff's Composite Exhibits A, B and I, and Exhibits C through H, J and K. These exhibits include records of Plumbhouse Construction that pertain to payroll, invoices, 1099 forms, bank statements, canceled checks, expenses, tax returns, and summaries of monies received by Plumbhouse Construction and paid by Plumbhouse Construction to Plaintiff.

the amount of $44,886.18 plus interest.  The parties have now stipulated that the principal amount Plaintiff is seeking is $37,598.73 ("Debt").

### A.  Plumbhouse Construction

Marshall Spies began doing business as "Plumbhouse Construction" in 1999.  Marshall Spies worked as a construction project foreman and Kelly Spies, who independently worked as a physical therapist, began to manage her husband's office and keep his books.  Kelly Spies volunteered her services to the business until early 2006, when she began to receive a paycheck.

Plaintiff is a building material supply company which entered into a credit relationship with Plumbhouse Construction in January 2006 when, according to Maurice Cleaver ("Cleaver"), Defendants opened a credit account.[4]  Kelly Spies completed an unsigned credit application on behalf of her husband ("Credit Application").  Pl.'s Composite Ex. I(A).  The Credit Application is in the name of "Marshall L. Spies, II," lists present employer as "self (Plumbhouse Construction)" and occupation as "owner/carpenter/elect."  The Credit Application makes no mention of nor does it contain any information personal to Kelly Spies.  Pl.'s Composite Ex. I(A).  At trial, Cleaver was unable to identify any written document or agreement between Plaintiff and Kelly Spies in which she personally acknowledged or assumed liability for the credit account.

Prior to approving the credit application, Cleaver testified that he met with the president of his company, Brad White, and Defendants.  Cleaver further testified that at that initial meeting he reviewed the terms of the credit account with Defendants and informed them of a contractor's obligations under "the New York trust laws."[5]  Cleaver testified that he told Defendants that they

---

[4] During his testimony, Cleaver often conflated the Defendants' identities and failed to distinguish between Marshall and Kelly Spies.
[5] All quoted language attributed to parties is based upon their oral testimony or exhibits introduced at trial.

should first pay their laborers, then their suppliers and, only afterwards, themselves, and that to do otherwise would be a crime.

Both Defendants testified that Kelly Spies was not an owner of Plumbhouse Construction and that she worked for the business solely as an office manager and bookkeeper, without decision-making or bill-paying authority. Cleaver testified that he dealt primarily with Kelly Spies on general account issues, including when payments could be expected. Cleaver further testified that Kelly Spies never indicated that she relied upon anyone else for authority to make payments. Marshall Spies testified, however, that he was the only authorized signatory on Plumbhouse Construction's business account maintained at HSBC Bank, N.A. and that he made all of the decisions about who to pay and when.

*B. The Ramsey Project*

In 2006, Matthew C. and Mary Beth Ramsey (the "Ramseys") engaged Plumbhouse Construction to construct two single-family houses at 10629 Cobbville Road ("Lot 1") and 10599 Cobbville Road ("Lot 2") in Adams, New York (hereinafter the "Ramsey Project" or "Project"). The written proposal from "Marshall L. Spies, II, Plumbhouse Construction" to build the two houses for $120,000.00 each was executed by the Ramseys on October 31, 2006. *See* "Proposal/Contract/Agreement" at Pl.'s Composite Ex. I(D) ("Contract"). According to Marshall Spies, these houses ultimately sold for approximately $220,000.00 each.

Cleaver testified that he first became aware of the Ramsey Project when Defendants met with him and requested a credit line increase. Cleaver's understanding was that the two houses were valued at about $120,000.00 each, and that Plaintiff would supply approximately $35,000.00 in materials per house. Cleaver could not say definitively that Marshall Spies

attended this meeting, but was certain that Kelly Spies was there. Cleaver testified that at that meeting, he again informed Defendants of a contractor's obligations under Article 3-A.

The Ramsey Project began the week of November 6, 2006. Plumbhouse Construction worked on the Project for 26 weeks. While the Ramsey Project was ongoing, Kelly Spies significantly increased the number of hours she worked for her husband's business and reduced the time she worked as a physical therapist to one or two days per week. For the first eight weeks of the Project, Kelly Spies' salary was $480.00 per week. For the next 18 weeks, Kelly Spies' weekly salary increased to $560.00, which corresponded to an increase in her weekly hours. Throughout the same period, Marshall Spies was compensated at the rate of $850.00 per week. Over the 26 weeks of the Project, Kelly Spies received wages of $13,920.00 and Marshall Spies received total compensation of $22,100.00.[6]

The Ramseys made an initial payment to Plumbhouse Construction of $25,000.00 on or about November 8, 2006. Thereafter, the Ramseys made additional payments of $215,000.00, for a total of $240,000.00.[7] Pl.'s Composite Ex. I(C).[8]

---

[6] This $22,100.00 is inconsistent with the $17,600.00 indicated on Pl.'s Composite Ex. A(E) as being the amount of wages paid to Marshall. When questioned concerning the discrepancy, neither Defendant could explain how the $17,600.00 figure was calculated. The court ascribes the difference to an accounting error and accepts Defendants' testimony at trial as to how much they were paid and over what period of time.

[7] This total excludes an additional $4,534.95 payment received by Plumbhouse Construction on April 2, 2007, for work not covered by the original Contract.

[8] Ramsey payments were received by Plumbhouse Construction as follows:

|  |  | Running Balance of Payments Received |
|---|---|---|
| Nov.  8, 2006 | $25,000.00 | $25,000.00 |
| Nov. 15, 2006 | 25,000.00 | 50,000.00 |
| Nov. 16, 2006 | 25,000.00 | 75,000.00 |
| Nov. 28, 2006 | 25,000.00 | 100,000.00 |
| Dec. 22, 2006 | 10,000.00 | 110,000.00 |
| Jan.   2, 2007 | 15,000.00 | 125,000.00 |
| Jan.   9, 2007 | 15,000.00 | 140,000.00 |
| Jan. 16, 2007 | 15,000.00 | 155,000.00 |
| Jan. 31, 2007 | 20,000.00 | 175,000.00 |
| Feb.   6, 2007 | 10,000.00 | 185,000.00 |
| Feb. 16, 2007 | 10,000.00 | 195,000.00 |
| Feb. 20, 2007 | 7,500.00 | 202,500.00 |

Beginning in December 2006 and continuing through mid-March 2007, Plaintiff supplied materials to Plumbhouse Construction for the Project.  By the end of December 2006, Plaintiff had supplied approximately $34,000.00 in materials.  Plaintiff introduced into evidence copies of invoices for materials delivered by Plaintiff for the Project.  Pl.'s Composite Ex. I(B).  An accounting shows the dates of receipt of payments from Plumbhouse Construction and the invoices satisfied by such payments.  Pl.'s Composite Ex. I(E).  The first payment received by Plaintiff was in the amount of $15,000.00 on January 4, 2007.  At that time, the credit account was more than 30-days past due.  Cleaver testified that Kelly Spies promised that another $20,000.00 payment would be forthcoming but only $3,000.00 more was paid that month.  The records reflect that by the time the two additional payments totaling $3,000.00 were made, Plumbhouse Construction had received an additional $30,000.00 from the Ramseys.  *See* Pl.'s Composite Ex. I(C) and (E).  Throughout this period, Defendants were each paid their weekly wages on the Project.

In February 2007, Plaintiff received a typed communication on Plumbhouse Construction letterhead signed by Kelly Spies as Office Manager.  This letter enclosed a $7,000.00 check and inquired about the possibility of making a payment arrangement in exchange for keeping the credit account open.  On the letter, Kelly Spies added the following hand-written note:

> I realize that we cannot operate our business without the support of our suppliers. We have just signed 4 big contracts to begin Mid March.  We have always kept our word & appreciate your business.  Please work with us & accept our payments.  We do need this account to remain open for upcoming projects.  The two houses went up so quickly that the account went higher than expected.  Please know that this will be paid promptly, I just need another month to catch up and start new projects.  Please do not stop the account.

| | | |
|---|---|---|
| Feb. 28, 2007 | 7,500.00 | 210,000.00 |
| Mar.  6, 2007 | 10,000.00 | 220,000.00 |
| Mar. 13, 2007 | 7,500.00 | 227,500.00 |
| Mar. 21, 2007 | 7,500.00 | 235,000.00 |
| Mar. 25, 2007 | 5,000.00 | 240,000.00 |

Plaintiff's Composite Ex. I(D).   Cleaver testified that based upon this hand-written note,  he believed Kelly Spies was authorized to make decisions with respect to payments on the outstanding account.

After receiving the February 2007 letter, Cleaver spoke with Kelly Spies on the telephone about the reasons for non-payment of the credit account.   Cleaver testified that Kelly Spies emphatically stated that they were being underpaid by the Ramseys who had requested additional work outside the scope of the original Contract for which they had not been paid.   Cleaver testified that when he asked Kelly Spies if Defendants had paid themselves, she  responded, "yes, we need to live too."   Cleaver further testified that during this telephone conversation with Kelly Spies he reiterated that contractors must pay suppliers before themselves.   Because the Debtors had kept their past promises to pay, Cleaver stated that he believed they would pay and kept the account open.

The record reflects that subsequent to the initial $15,000.00 payment, Plumbhouse Construction paid an additional $15,000.00 to Plaintiff as follows:

$1,500.00 on Jan. 09, 2007
$1,500.00 on Jan. 17, 2007
$7,000.00 on Feb. 09, 2007
$2,500.00 on Mar. 01, 2007
$2,500.00 on Mar. 01, 2007

*See* Pl.'s Composite Ex. I(E).   Throughout the time period these payments were made, Plaintiff continued to supply materials.   By the second week of March 2007, Plaintiff delivered the last of the materials for the Ramsey Project.   Pl.'s Composite Ex. I(D).   Cleaver testified that Plaintiff supplied a total of approximately $69,000.00 in materials and received payments of

approximately $29,000.00.[9]    During the Ramsey Project, Plumbhouse Construction's credit account was never paid in full.

Plumbhouse Construction did not finish the Ramsey Project.  Marshall Spies testified that on advice of counsel, Plumbhouse Construction terminated its relationship with the Ramseys prior to the Project's completion.

Defendants acknowledge that the Ramseys paid the $240,000.00 due under the Contract, plus an additional invoice of $4,534.95.  Defendants insist, however, that verbal change orders and additional expenses increased the total cost of the job to over $300,000.00.  Kelly Spies testified that "approximately $87,000.00" remains due from the Ramseys and that prior to bankruptcy, Plumbhouse Construction had commenced a state court action against the Ramseys to recover this amount.

Marshall Spies claims to have invested approximately $28,000.00 of personal funds into the business during the course of the Project.  The HSBC business checking account statements reflect deposits of $50,999.92 that do not correspond to payments made by the Ramseys during the twenty-six week period that the Project was ongoing (November 8, 2006 through May 3, 2007).  Pl.'s Composite Ex. A(D) and Ex. G.[10]

Much of the Defendants' testimony addressed the books and records kept by Plumbhouse Construction on the Ramsey Project.  Marshall Spies testified that Kelly Spies kept track of payments received and expenses incurred and paid on the Project.  Marshall Spies testified that Plumbhouse Construction did not maintain separate books for the Project because it had no other

---

[9] Pl.'s Composite Ex. I(E) reflects Plaintiff's receipt of payments from Plumbhouse Construction totaling $30,000.00 for the period from January 4, 2007 through March 1, 2007.
[10] The court observes that prior to the deposit of the first Ramsey payment, the balance in the HSBC checking account on November 8, 2006 was $6,028.87 and was $6,296.82 on May 3, 2007, the last day of work on the Project.  Thus, the court concludes that all funds received from the Ramseys were expended by Defendants during the Project, plus $50,999.92.

significant projects.  Marshall Spies testified that his employees kept track of their hours on a weekly basis through the use of handwritten payroll logs.  Payroll logs covering the period from November 6, 2006 through January 3, 2007 were introduced into evidence.[11]  These logs were ultimately delivered to Kelly Spies, who reported the hours to the company's payroll service. Pl.'s Composite Ex. A(B).  Defendants also produced a summary of payments received from the Ramseys, as well as labor and other related costs for the Ramsey Project.  Pl.'s Composite Ex. A(E).  Bank records establish that each payment received from the Ramseys was deposited into the business bank account maintained at HSBC Bank, N.A.  Pl.'s Composite Exs. A(D), F and G. Defendants did not produce, however, a clear accounting of how payments received from the Ramseys were applied.

C.  *Liens filed against the Ramsey Project*

On April 24, 2007, Plaintiff filed a lien against Lot 1 in the amount of $25,111.91, plus interest.  On May 8, 2007, Plaintiff filed a lien against Lot 2 in the amount of $14,893.10, plus interest.  Pl.'s Composite Ex. I(D).  Both liens identify Marshall Spies as the person with whom Plaintiff contracted and as the person to whom materials were furnished.  Pl.'s Composite Ex. I(D).

Plaintiff commenced an action in New York State Supreme Court against the Ramseys, Marshall Spies, II d/b/a Plumbhouse Construction, *et al.* Pl.'s Composite Ex. I(D).  Kelly Spies was not a named defendant in that action nor did Plaintiff demand payment from her prior to commencement of this adversary proceeding.  On December 3, 2008, a consent judgment against Marshall Spies, II d/b/a Plumbhouse Construction was entered in  New York State Supreme Court (Index No. 2007-2870) in the amount of $44,886.18.  Pl.'s Composite Ex. I(D).   The

---

[11] Defendants have not accounted for payroll logs for the period January 4, 2007 through April 4, 2007, which were missing from Defendants' records.

Ramseys settled the state court litigation with Plaintiff for $5,000.00.    Marshall Spies commenced a separate state court action against the Ramseys which was still pending when the Debtors filed for bankruptcy.

ARGUMENTS

Based upon the pleadings and the record, Plaintiff asserts a claim for fraud and two claims of defalcation under Article 3-A: (1) by inference based upon Defendants' failure to keep adequate books and records; and, (2) by actual diversion in the expenditure of funds for non-trust purposes.  All of the claims are based upon the same set of facts.

With respect to the claims of defalcation, Plaintiff advances two primary arguments. First, Plaintiff alleges that Defendants were statutory trustees under Article 3-A, and in such fiduciary capacity did not observe their obligation to keep appropriate books and records. Plaintiff argues that this failure gives rise to a presumption of diversion of trust funds under Article 3-A.    Second, Plaintiff alleges that Defendants misappropriated trust funds when they paid themselves wages and paid other expenses that Plaintiff categorizes as overhead.  Plaintiff asserts that both the failure to keep proper books and records and diversion of trust funds constitute defalcation under Code § 523(a)(4) such that the Debt should be nondischargeable.

Although Marshall Spies' role as a fiduciary is not contested, Kelly Spies denies that she was a fiduciary under Article 3-A.  Defendants contend that adequate books and records were kept.  As to the alleged misappropriation of funds, Marshall Spies argues that because he labored on the Project, he held a dual role of both trustee and beneficiary of the trust funds.  Defendants contend that payment of Kelly Spies' wages and certain overhead expenses such as equipment costs and office expenses were for a purpose consistent with the purpose of the trust.  Defendants further argue that any breach of fiduciary duty was not willful or deliberate.  Lastly, Defendants

10

argue that they expended all of the trust funds from the Ramseys on the Project and, therefore, were never out of trust.[12]

DISCUSSION

The United States Supreme Court has acknowledged that bankruptcy "provide[s] a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan*, 498 U.S. at 268 (citing *Local Loan Co.* v. *Hunt*, 292 U.S. 234, 244 (1934)). The purpose of the Code is to provide this fresh start to the "honest but unfortunate debtor." *Id.* at 287. To give maximum effect to the policy of the Code to provide debtors with this "fresh start," exceptions to discharge are strictly construed. *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997), *aff'd*, 523 U.S. 57 (1998). "The consequences to a debtor whose obligations are not discharged are considerable; in many instances, failure to achieve discharge can amount to a financial death sentence." *Hyman*, 502 F.3d at 66. "In view of these harsh consequences, exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *Id.* (citing *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000); *In re Hayes*, 183 F.3d 162, 167 (2d. Cir. 1999)).

Section 523(a) provides, in pertinent part, that a discharge "does not discharge an individual debtor from any debt... (4) for fraud or defalcation while acting in a fiduciary capacity ... ." To prevail, Plaintiff must prove all claims under § 523(a)(4) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The court shall consider the evidentiary record as to first, a claim for fraud; and second, a claim for defalcation.

---

[12] In their post-trial brief, Defendants raised a one-year statute of limitations defense. Even if this defense was timely raised, it must fail. When a contractor does not complete work and abandons a project, New York's "catc[h]all" six-year statute of limitations applies. *G.W. White & Son v. Tripp*, 1995 U.S. Dist. LEXIS 1887 *9 n.3 (N.D.N.Y. Feb. 14, 1995) (citing *In re Grosso*, 9 B.R. 815, 823 (Bankr. N.D.N.Y. 1981); N.Y. C.P.L.R. § 213(1)).

### A.  Code § 523(a)(4) – Fraud Claim

The general common law elements of fraud are incorporated by the Code.  *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006).  Those elements include "a false representation of material fact, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury."  *Id.* (referencing *Channel Master Corp. v. Aluminum Ltd. Sales*, 151 N.E.2d 833, 835 (N.Y. 1958)).  A mere promise to pay, and nothing else, cannot give rise to a fraudulent representation.  *See Balzano v. Balzano, (In re Balzano)*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991).  Otherwise, virtually every debt would be nondischargeable.  *Id.*  To establish a promise was fraudulent, Plaintiff must prove by a preponderance of the evidence that Debtor did not intend to perform the promise at the time it was made.  *Id.*

Although a claim for fraud was not pled with particularity as required by Federal Rule of Bankruptcy Procedure 7009, which incorporates Rule 9 of the Federal Rules of Civil Procedure, no motion was made to strike the claim, and, therefore, the court considers the evidence presented at trial.  Cleaver testified about two allegedly false representations made by Kelly Spies concerning future payments to Plaintiff.  The first representation was made in late December 2006 when Kelly Spies told Cleaver that a $20,000.00 payment would be forthcoming, which was never made.  The second representation was contained in the handwritten note on the letter sent to Plaintiff in February 2007, in which Kelly Spies wrote "[p]lease know that this [account] will be paid promptly, I just need another month to catch up and start new projects."  Any claim for fraud must be based up one or both of these two representations.

Plaintiff provided no evidence to support the allegation of fraud, other than Cleaver's

12

testimony.  Although Kelly Spies does not deny making the statements, there is nothing in her testimony from which this court could infer Kelly Spies knowingly made a false statement with the intent to deceive Plaintiff.  On the contrary, this court concludes that Kelly Spies, speaking on behalf of Plumbhouse Construction, had every intention to pay Plaintiff what was owed. Furthermore, Plaintiff and Defendants had a long-standing business relationship.  Plaintiff's continued extension of credit was just as likely based upon Plumbhouse Construction's history of payment on its outstanding accounts.

In light of the lack of evidence, the court finds that Plaintiff failed to establish that Kelly Spies acted with "actual wrongful intent" when she made said representations.  *See Hyman*, 502 F.3d at 68; *In re Zois*, 269 B.R. 89, 101 (Bankr. S.D.N.Y. 1999) (requiring a showing of intentional deceit to establish fraud).  The court concludes the Plaintiff failed to carry its burden of proof in establishing the elements of fraud and, accordingly, will separately dismiss the claim.

### B.  Code § 523(a)(4) – Defalcation While Acting in a Fiduciary Capacity

In addition to a claim for fraud, this case presents a claim that misappropriation of trust funds under Article 3-A of the Lien Law constitutes "defalcation" under Code § 523(a)(4).  To prevail, Plaintiff must prove that Defendants were trustees pursuant to an express trust that gave rise to a fiduciary duty and that Defendants committed "defalcation" in the course of that relationship under the recently elevated standard enunciated by the Second Circuit.  *Denton v. Hyman* (In re Hyman), 502 F.3d 61, 68 (2d Cir. 2007), *cert. denied*, 129 S.Ct. 895 (2009).  Under both pre-Code law and cases decided after the passage of the Bankruptcy Reform Act of 1978, New York Bankruptcy Courts had found that a debtor's diversion of Article 3-A trust funds constituted a defalcation within the meaning of § 523(a)(4), rendering the debt

13

nondischargeable.[13]   However, in 2007 the Second Circuit issued the *Hyman* decision which held

that to establish defalcation under § 523(a)(4), a plaintiff must show that a defendant acted with

either "conscious misbehavior or extreme recklessness-a showing akin to the showing required

for *scienter* in the securities law context." *Hyman*, 502 F.3d at 68.   By adding the element of

*scienter*, the *Hyman* decision significantly heightened the applicable showing required by a

plaintiff alleging a § 523(a)(4) claim of nondischargeability based upon defalcation.   It is this

heightened standard against which Plaintiff's claim is measured.

Before considering whether a defalcation occurred, the court must first determine

whether Defendants acted in a fiduciary capacity. *See Andy Warhol Found. For Visual Arts, Inc.*

*v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir. 1999) (citing *Davis v. Aetna Acceptance Co.*,

293 U.S. 328, 333 (1934)).   The fiduciary relationship under § 523(a)(4) requires an actual or

express trust. *Erie Materials, Inc. v. Oot (In re Oot)*, 112 B.R. 497, 500 (Bankr. N.D.N.Y.

1989); *see also Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934).

Bankruptcy courts have long recognized that the provisions of Article 3-A create an

express statutory trust that gives rise to the fiduciary duty contemplated by Code § 523(a)(4).

*See Giarrusso Building Supplies, Inc. v. Hogan (In re Hogan)*, 193 B.R. 130, 137 (Bankr.

N.D.N.Y. 1995).   Only "an owner, contractor or subcontractor is designated as a prospective

trustee under Article 3-A." *Truax & Hovey, Ltd. v. Grosso (In re Grosso)*, 9 B.R. 815, 824

(Bankr. N.D.N.Y. 1981) (citing *ALB Contracting Co., Inc. v. York-Jersey Mortgage Company*

*and Lockport Construction Co., Inc.*, 60 App.Div.2d 989, 401 N.Y.S. 2d 934 (4th Dep't 1978));

Article 3-A § 70, subd. 2.   The Ramseys, and not the Defendants, were owners of the property.

---

[13] *See e.g.*, *Giarrusso Building Supplies, Inc. v. Hogan (In re Hogan)*, 193 B.R. 130 (Bankr. N.D.N.Y. 1995); *Burt Bldg. Material Corp. v. Silba (In re Silba)*, 170 B.R. 195 (Bankr. E.D.N.Y. 1994); *Erie Materials, Inc. v. Oot* (In re Oot), 112 B.R. 497 (Bankr. N.D.N.Y. 1989); *see also Matter of Kawczynski*, 442 F. Supp. 413 (W.D.N.Y. 1977) (Bankruptcy Act case).

Accordingly, in order to establish that Defendants were trustees under Article 3-A, Plaintiff must first establish that each Defendant qualifies as a "contractor."

The term "contractor" is defined as meaning "a person who enters into a contract with the owner of real property for the improvement thereof ... ." N.Y. Lien Law Article 1 § 2, subd. 9. Funds received by a contractor in connection with a contract for the improvement of real property constitute assets of a trust. Article 3-A § 70, subd. 1. A trust commences at the time when any asset thereof comes into existence. Article 3-A § 70, subd. 3.

Under the foregoing standard, Marshall Spies' status as a fiduciary is readily established. Marshall Spies entered into the contract with the Ramseys in his capacity as a contractor. On November 8, 2006, upon his receipt of the initial $25,000.00 payment from the Ramseys, he became a trustee. Article 3-A § 70. The court finds that as an Article 3-A trustee, Marshall Spies acted in a fiduciary capacity with respect to the Plaintiff for purposes of Code § 523(a)(4).

As to Kelly Spies, Defendants testified that she was not an owner of Plumbhouse Construction, did not have decision-making authority with respect to payments, was not an authorized signatory on the business account, and was not a party to the Contract. In correspondence to Plaintiff, Kelly Spies signed as "Office Manager." The Plaintiff failed to establish that Kelly Spies was personally obligated to the Plaintiff pursuant to any written or oral agreement. As Office Manager and bookkeeper, Kelly Spies was an integral part of Plumbhouse Construction with knowledge of the business' finances. Additionally, it was Kelly Spies who worked most closely with Plaintiff and it was Kelly Spies who beseeched Plaintiff to keep the credit account open when the account was delinquent. And, not insignificantly, Kelly Spies had a personal stake in the success or failure of the business by virtue of her spousal relationship with Marshall Spies.

Notwithstanding Kelly Spies' unique relationship to Plumbhouse Construction, the court finds that Kelly Spies was not a "contractor" as defined in Article 1 § 2, subd. 9 of the N.Y. Lien Law.   The Contract clearly shows Marshall Spies d/b/a Plumbhouse Construction contracted with the Ramseys, not Kelly Spies.   At the time the Contract was executed, Kelly Spies was working primarily as a physical therapist.   She held the position of Office Manager and bookkeeper on a volunteer basis for approximately seven years.   At the time the trust arose on November 8, 2006, Kelly Spies was merely an employee of Plumbhouse Construction.   Her intimate knowledge of the business' finances, position as Office Manager and bookkeeper, and commitment to the success of her husband's business do not elevate Kelly Spies to the fiduciary status of a trustee under Article 3-A. *See e.g.*, *Grow Up Japan, Inc. v. Yoshida (In re Yoshida)*, 435 B.R. 102 (Bankr. E.D.N.Y 2010) (holding "[a]n employment relationship alone does not give rise to a fiduciary relationship for purposes of nondischargeability of a debt in bankruptcy under [Code] § 523(a)(4).   Nor does the elevation of an employee to a managerial position bring into being a fiduciary relationship within the purview of § 523(a)(4).").

This finding is further supported by the fact that Kelly Spies was not named in the mechanics liens filed by Plaintiff against the Project, nor in the state court action commenced by Plaintiff that resulted in the consent judgment.   In weighing the evidence, this court finds that Plaintiff did not meet its burden of proving that Kelly Spies was a trustee under an express trust that gave rise to a fiduciary duty to the Plaintiff.   As such, the claims against Kelly Spies are dismissed.

*1.   Diversion of Trust Funds under Article 3-A by Inference Arising from the Failure to Keep Books and Records*

As a trustee, Marshall Spies was obligated to maintain books and records sufficient to identify: (1) trust assets receivable; (2) trust accounts payable; (3) trust funds received; and (4)

16

trust payments made with trust assets.  Article 3-A § 75, subd. 3.  The failure of a trustee to keep the books or records required by § 75 of the Lien Law is "presumptive evidence that the trustee has applied or consented to the application of trust funds actually received by him as money … for purposes other than a purpose of the trust."  Article 3-A § 75, subd. 4.  For the reasons discussed below, the court finds that Marshall Spies did not keep the books and records required by Article 3-A and Plaintiff is entitled to the presumption of a diversion of trust funds.

As a fiduciary, Marshall Spies was obligated to follow the requirements set out in Article 3-A § 75, subd. 3.  The books and records maintained should have included the name and address of each person: (A) for whom there existed a right to receive funds constituting assets of the trust; (B) to whom Plumbhouse Construction had incurred a trust obligation constituting a trust claim; (C) from whom funds constituting trust assets were received; (D) and to whom a payment for the purposes of the trust had been made with trust funds.  Article 3-A § 75, subd. 3(A-D).  A statement identifying either the transaction or contract from which the trust claim arose and an indication of whether the claim was then due is also required.  Article 3-A § 75, subd. 3(B).  Records were required to be kept which indicated the amount of each claim or payment and the date when they became due, earned or otherwise payable.  Article 3-A § 75, subd. 3(A-B).  Where payments are made from trust assets, the books must specify the nature of the trust claim paid and whether payment was by cash or check.  Article 3-A § 75, subd. 3(C).  Finally, records must indicate the date and amount of payments received and, if deposited in a bank account, the name and address of the bank.  Article 3-A § 75, subd. 3(D).

The court admitted into evidence a statement prepared by Plumbhouse Construction, addressed to Matthew Ramsey, which contains four columns: Date, Transaction, Amount and Balance. Pl's Composite Ex. I(C).  This statement itemizes the amounts and dates of payments

received from the Ramseys. *Id.* The court finds the statement is deficient in that it does not indicate if "Date" means the date payment was due or earned or the date payment was received. Furthermore, the statement fails to identify the name and address of the bank into which funds were deposited. In addition, there are insufficient records of trust accounts payable or trust payments made with trust assets. Thus, the books and records produced by Plumbhouse Construction are insufficient to satisfy the requirements of Article 3-A § 75, subd. 3.

The inadequacy of the records is supported by the testimony of the bookkeeper, Kelly Spies, who testified that she had no knowledge that separate books and records must be kept for each job and that she had never kept such books in the course of her husband's business. Similarly, when Marshall Spies was asked on direct examination if he was aware of a contractor's obligation to account for money received and to keep a separate set of books under New York's Lien Law, Marshall Spies responded, "I was not aware of that until a couple of weeks ago."

The court finds that the books and records maintained by Plumbhouse Construction do not comport with the strictures of Article 3-A § 75 subd. 3 and that Plaintiff is entitled to the presumption that Defendant Marshall Spies diverted or consented to the diversion of trust funds.[14]

### 2. Diversion and Misappropriation of Trust Funds under Article 3-A by Direct Evidence

Plaintiff alternatively claims the Defendants committed defalcation through misappropriation of trust funds when they paid themselves their wages. Defendants do not deny

---

[14] Defendants did not produce records detailing invoices sent to the Ramseys, expenses incurred for materials, labor costs, equipment rentals, the payments received from the Ramseys, or payments made on account of the expenses incurred on the Project. The court notes that Defendants did not illuminate how their records complied with Article 3-A § 75, subd. 3, but rather appear to rely on the various source documents produced by Defendants and Plaintiffs and admitted into evidence. These include, *inter alia,* payroll records, invoices, 1099 forms, bank statements, canceled checks, various summaries and tax returns. Pl.'s Composite Ex. A, Ex. B, Ex. F, Ex. G, Ex. H and Composite Ex. I. The court's attempt to distill the information required by Article 3-A § 75, subd. 3 from the piecemeal evidence admitted at trial proved futile.

these payments were made, but contend that (i) as a "laborer" on the Project, Marshall Spies was a beneficiary of the trust fund and entitled to pay himself from trust assets, (ii) payment of Kelly Spies' wages and certain overhead expenses such as equipment costs and office expenses were for a purpose consistent with the purpose of the trust, and (iii) any payment made for other than a purpose of the trust was made from funds personally injected into the business through the sale of personal property and a home equity line.

The court rejects Defendant's argument that Marshall Spies was a beneficiary of the trust fund who was entitled to pay himself for his direct work on the Project.  As a contractor, Marshall Spies cannot also be a beneficiary of the trust fund.  *See Louis Greenberg, Inc. v. Instant Heat & Power Corp.,* 33 Misc. 2d 1081, 1082 (N.Y. Sup. Ct. 1962) ("*Greenberg*").  In *Greenberg,* the defendant contractors/trustees argued that they could be reimbursed for work they had done on the project in advance of payment to a materialman.  The New York Supreme Court held:

> A contractor who receives trust money is not, by the provisions of sections 70 and 71, (subd. 2 par. [a]) of the Lien Law, included as one of the beneficiaries of the trust assets. The recipient of the trust funds holds them for the benefit of the sub-claimants on the improvement, who are enumerated in the statute, and is entitled to any remainder *only* after the payment of their claims (*Aquilino v. United States of America*, 10 N.Y.2d 271; *American Blower Corp. v. James Talcott, Inc.*, 10 N.Y.2d 282).

*Greenberg*, 33 Misc. 2d at 1082.  The *Greenberg* court stated that the defendants, as contractors/trustees "obviously may not frustrate … [a materialman's] recovery by the assertion of prior rights or reduce it by purporting to share in the beneficiary rights accorded to the … [materialman] by the statute." *Id.* at 1083.  The *Greenberg* court likened the defendants' argument to "an attempt to establish a credit on a *quantum meruit* basis for work done on the job and thus wipe out plaintiff's rights as a beneficiary of the trust fund..." *Id.* at 1082.

As a contractor, Marshall Spies is a "resulting beneficiary," who is entitled to any remaining trust assets only after the fund has been distributed so as to first pay all trust fund claims in full. *See Id.* at 1083; *see also, Niaztat Iron Works, Inc. v. Tri-Neck Const. Corp.*, 62 Misc. 2d 228, 230 (N.Y. Sup. Ct. 1970). Prior to full distribution to claimants, any payment to Marshall Spies was a payment made for other than a purpose of the trust. Based upon the fact that at no time during the course of the Project was Plaintiff paid in full, the court finds that there was never a remainder from which Marshall Spies could appropriately draw. Plaintiff had continuous trust beneficiary status beginning in December 2006 and, as such, was entitled to payment from trust funds prior to Defendant's payment of any non-trust claim.

The court must also reject Defendant Marshall Spies' argument that payment of Kelly Spies' wages and certain overhead expenses such as equipment costs and office expenses was for a purpose consistent with the purpose of the trust. These payments were administrative in nature and were not authorized disbursements from the trust fund. *See Niaztat Iron Works*, 62 Misc. 2d at 230. In *Niaztat*, the New York State Supreme Court held that administrative expenses such as rent, telephone, automobile, accounting, bookkeeping, and miscellaneous office expenses, as well as personal draws by a principal, were not permitted expenses under Article 3-A section 71 subd. 2. *Id.* at 231. The *Niaztat* court found that these expenses were not authorized disbursements from the trust fund and disallowed them, stating that "[t]o hold otherwise would be to authorize every trustee of a trust fund under the Lien Law to deduct at will his own office overhead expenses thereby providing a ready means to exhaust trust funds. Such a holding would be contrary to the provisions of the Lien Law." *Id.* Accordingly, the court concludes that payments by Plumbhouse Construction for the Defendants' wages and other overhead expenses were made for other than a purpose of the trust at a time when there existed no trust remainder.

The court next considers Defendant's argument that the payments made for other than a purpose of the trust were made from funds other than trust funds. For this court to find that Marshall Spies, as trustee, diverted trust funds, Plaintiff must present evidence that Marshall Spies applied trust assets for non-trust purposes. *See Truax & Hovey, Ltd. v. Grosso (In re Grosso)*, 9 B.R. 815, 825 (Bankr. N.D.N.Y. 1981). In considering whether diversion occurred, "the fiduciary bookkeeping duties imposed on a trustee by § 75 of the Lien Law apparently exist to aid [the court in making] that determination." *Id.* Marshall Spies testified that he invested $28,000.00 of personal funds into the business. The court does not doubt the veracity of this statement. Marshall Spies' testimony is supported by the business bank statements that show deposits totaling $50,999.92 during the twenty-six week long Project. These deposits comprised of non-"Ramsey trust funds" exceed the $37,598.73 claimed by Plaintiff to have been misappropriated by Plumbhouse Construction. It is possible that all of Defendants' wages, and the administrative "overhead" expenses were paid by non-trust funds; however, the record is devoid of any testimony concerning how these deposits were disbursed and the court is left to speculate as to what expenses were paid with the $50,999.92. Marshall Spies' defense that all trust funds received were exhausted prior to payment of Plaintiff's claim due to cost overruns similarly must fail, notwithstanding the likelihood that the Project cost far exceeded the amount received from the Ramseys.

The court finds that trust funds were diverted when used to pay Defendants' wages and other overhead expenses (collectively, the "Payments") at a time when there was an outstanding trust obligation owed to Plaintiff. Based on the record made in this proceeding, the court is unable to conclude that Marshall Spies used personal funds, and not trust funds, to make the Payments. Having found that Plaintiff is entitled to a presumption that trust funds were diverted

and were in fact misappropriated, the court must now determine whether the diversion and/or misappropriation of trust funds under the Lien Law constitutes defalcation within the meaning of Code § 523(a)(4).

  3.  *Scienter*

As the Second Circuit has found, "defalcation" does not encompass the same level of culpability as "fraud," for otherwise, the other terms appearing in § 523(a)(4), "fraud," "embezzlement," and "larceny," would be diluted. *Hyman*, 502 F.3d at 68. Nonetheless, the harshness of nondischargeability must be "reserved for those who exhibit 'some portion of misconduct.'" *Id.* at 69 (quoting *Cent. Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 512 (2d. Cir. 1937)). Balancing these two concerns, the *Hyman* court aligned itself with the First Circuit, which interprets "defalcation" as requiring a degree of fault "closer to fraud, without the necessity of meeting a strict specific intent requirement." *Hyman*, 502 F.3d at 68 (citing *Baylis v. Rutanen (In re Antonia Quevillon Trust)*, 313 F.3d 9, 20 (1st Cir. 2002)).

The key distinction between defalcation and fraud is that "[t]o show defalcation, a creditor need not prove that a debtor acted knowingly or willfully" with the "intent to accomplish the precise criminal act with which he is charged." *Baylis*, 502 F.3d at 19-20; *see also Hyman*, 502 F.3d at 68. The *Hyman* decision also makes clear that this standard cannot reach debtor-fiduciaries "who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable." *Hyman*, 502 F.3d at 69. Rather, the required showing is "conscious misbehavior or extreme recklessness." *Id.* at 68.

The standard articulated in *Hyman* is "akin to the showing required for *scienter* in the securities law context." *Id.* at 68. To establish *scienter*, plaintiffs have "the burden of alleging

22

that defendants had knowledge of specific facts or documents that they disregarded." *In re Rhodia S.A. Sec. Litig.*, 531 F.Supp 2d 527, 549-550 (S.D.N.Y. 2007). "Similarly, in the bankruptcy context, a plaintiff must demonstrate that the defendant had actual knowledge of the fiduciary duty that was breached in order to establish that the resulting debt is non-dischargeable under § 523(a)(4)." *E. Armata, Inc. v. Parra (In re Parra),* 412 B.R. 99, 106 (Bankr. E.D.N.Y. 2009); *see also, Econ. Dev. Growth Enters. Corp. v. McDerrmott (In re McDermott),* 434 B.R. 271 (Bankr. N.D.N.Y. 2010).

The court has serious reservations concerning Defendant Marshall Spies' actual knowledge of his fiduciary duty to Plaintiff. The Ramsey Project started and ended prior to the issuance of the Second Circuit's *Hyman* decision on September 6, 2007. Since "conscious misbehavior" has been introduced into the § 523(a)(4) analysis, the court has no doubt that Plaintiff may now be telling its customers about their obligations under the Lien Law in a concerted attempt to help establish actual knowledge from which one might infer conscious misbehavior. However, it is highly doubtful that Plaintiff communicated to Defendants at the outset of the Ramsey Project, and before the sea change wrought by *Hyman,* the obligations of a trustee under the Lien Law. The self-serving testimony of Cleaver conflicts with that of Defendants concerning Defendants' actual knowledge of the fiduciary duties attendant to the role of an Article 3-A trustee. Cleaver testified that he specifically informed Defendants of a trustee's obligations under the Lien Law at the initial meeting conducted in January of 2006. Marshall Spies testified that there was no discussion of the Lien Law at the January 2006 meeting. Kelly Spies similarly testified that there was no discussion of the Lien Law at the meeting and that she did "not know that law." Cleaver also testified that subsequent to his receipt of the February 2007 letter from Kelly Spies, he spoke with Kelly Spies on the phone and

reiterated to her that it is a contractor's obligation to pay suppliers before the contractor pays himself. Kelly Spies testified that Cleaver told her no such thing and that she did not recall that Cleaver had ever advised her that suppliers and laborers must be paid before other expenses. Kelly Spies testified that it was never her understanding that she and her husband were not entitled to be paid until all material suppliers had been paid in full from the proceeds of the job and that she "didn't know anything about the lien law until recently." Marshall Spies testified that at the time of the Ramsey Project he did not know that he had to pay for labor and materials before he paid any other expenses. The testimony of Defendants generally, and specifically with regard to their actual knowledge of a contractor's obligations under the Lien Law, was consistent and credible and the court accepts it as truthful. Notwithstanding Cleaver's testimony that he mentioned a contactor's duties under the Lien Law to the Defendants on three occasions, it is apparent to the court that he either did not do so or that if it was mentioned, it was in such manner that the Defendants neither understood nor appreciated what they were told.

There was testimony that prior to the Ramsey Project, Plumbhouse Construction was such a good customer of Plaintiff that Marshall Spies and his wife were treated to a vacation cruise. During the course of the Ramsey Project, Defendants were in constant contact with Cleaver concerning the credit account and Cleaver believed Defendants would, as they had in the past, pay the account in full. Defendants' belief that they would be paid in full for the work they did that exceeded the scope of the original Ramsey Contract, and further belief that such payment would permit them to satisfy the expenses incurred on the Project is supported by Defendants' investment of approximately $51,000.00 of non-"Ramsey trust funds" into Plumbhouse Construction during the Project. Measured against a reasonable person standard, Marshall Spies' conduct does not rise to the level of extreme recklessness. Furthermore,

following his default in payment to Plaintiff, Marshall Spies entered into a consent judgment for the amount due and commenced a state court action to recover payments allegedly due from the Ramseys. His conduct is not consonant with someone recklessly disregarding his obligations.

The court regards Defendants as "honest but unfortunate debtors" who were financially devastated when they were not paid the amount which they claim they were owed on the Ramsey Project. The court finds that knowledge of any fiduciary duty to Plaintiff was lacking. The court further finds that the failure to pay Plaintiff before non-trust claims and to keep the required books and records does not, under the facts of this case, constitute the kind of "conscious misbehavior" or "extreme recklessness" contemplated by the Second Circuit in *Hyman* and does not suffice to hold the debt nondischargeable.

## CONCLUSION

For the foregoing reasons, the court concludes that, as a matter of law, Plaintiff has not met its burden to prove that Defendant Marshall Spies had the requisite *scienter* to support a claim under Code § 523(a)(4). A separate judgment dismissing the complaint will be entered in accordance with Fed. R. Bankr. P. 9021.

Dated:  July 29, 2011
        Syracuse, New York

Margaret Cangilos-Ruiz
U.S. Bankruptcy Judge